REBECCA HOWLAND *vs.* KAPIKA NAONE *et al.*

APPEAL FROM DECISION OF AUSTIN, J.

JANUARY TERM, 1885.

JUDD, C. J.; McCULLY and AUSTIN, JJ.

The Court declines to set aside two deeds on the alleged ground of fraud practiced upon the grantor, an aged Hawaiian, feeble in mind and body ; there being no convincing proof that he was unduly influenced.

Circumstances of mere suspicion, leading to no certain results, will not be deemed a sufficient ground to establish fraud.

Decree, dismissing bill, affirmed.

OPINION OF THE COURT, BY JUDD, C. J.

THIS case comes up on appeal from a decision of Mr. Justice Austin, rendered January 7, 1885, dismissing the bill.

After hearing the proofs and arguments of counsel, and on a careful examination of the case, we are of the opinion that the decision herein made should be affirmed, and accordingly dismiss the bill.

We add that the decedent Kalaau, having settled his land upon his wife Kapika, was entitled during his life to the possession of the estate and its rents and profits, by virtue of his being her husband. This was no more favorable to his wife than the will first made to her. The fact that he afterwards changed his mind and made a will in favor of the plaintiff, for whom he is shown by the testimony of Mr. Holt to have had most friendly and pa-

ternal feelings some fifteen or twenty years ago, while his first wife, Maalo, was alive, does not overcome the clear testimony of Mr. Widemann and others that he executed the deeds to defendants with a full understanding of their import and effect.

*S. B. Dole*, for plaintiff.

*F. M. Hatch* and *A. Rosa*, for defendants.

Honolulu, March 18, 1885.

## DECISION OF AUSTIN, J., APPEALED FROM.

This is an action in equity to set aside two deeds, by which certain real estate, worth about $5,000, situated in Honolulu, was vested in the defendant, Kapika Naone.

The plaintiff claims to be entitled to the property as sole devisee of Kalaau, deceased, the former husband of defendant Kapika, by a will bearing date October 28, 1882, and duly proved March 25, 1884.

The deeds bear date respectively November 17, 1882, and were duly acknowledged on that day, and duly recorded on the 23d day of November, 1882. One of the deeds was from Kalaau, deceased, to the defendant Alakema Naone, and the other deed was from him to the defendant Kapika, the wife of deceased, and both were executed with the apparent intention of vesting the property in her, because she was Kalaau's wife. Kalaau died on the 2d day of February, 1884, and was then a man of over eighty years of age. For many years he had been nearly blind, but until within two or three weeks of his death was able to walk and to get about his own premises without aid. At the time of the execution of the will and deeds, and thereafter till a very few days before his death, his mind was usually clear, and he could see and recognize those people he knew, and talk rationally with them. He was feeble both in mind and body, owing to his great age, but he was not insane. He was of fair understanding for one of his years. Doubtless, when he executed the will and deeds referred to, and a prior will in favor of his wife, dated July 30, 1881, he was of sound mind, and of sufficient capacity to make such instruments.

But twenty days passed between the signing of the will to the plaintiff and the deeds to the defendants. There is no proof of

change in his brain power during that time.	In order to recover,
then, the plaintiff must show that Kalaau was deceived and
cheated, and did not know what the deeds meant, and did not
intend to vest the land in his wife; that he was unduly controlled
and influenced by the defendants, and by them or one of them
induced to do what he did not comprehend.

The testimony bearing on those points is voluminous on both
sides.	Kalaau and Kapika were married in 1874, and lived to-
gether in harmony until sometime after the execution of the will
in Kapika's favor, bearing date July 30, 1881.	After that, and
at the time of the making of the will of October 28, 1882, in favor
of the plaintiff, the plaintiff's proof tends to show that Kapika
was untrue to her marriage vow; that the defendant Alakema
Naone was her paramour; that Kalaau knew it, and therefore felt
hostile to her, and designed to disinherit her on that account by
the will to the plaintiff.	The plaintiff's proofs also tend to show
that Kapika failed many times properly to attend to the physical
wants of Kalaau during the last year of his life.

The defendants were married about six months after the death
of Kalaau.	They both swear that they were not guilty of adul-
tery together, and their proof tends to show that Kalaau was well
and faithfully treated by Kapika, as his wife, up to the time of
his death.	Kapika is still a young woman, apparently about
thirty years old, and her husband is apparently younger than she.

Kalaau and Kapika had no children, and by the proof Kapika
was Kalaau's sole heir.	If so, but for the will to the plaintiff,
Kapika would have taken all the property by descent, and half of
it, in addition to dower, in any event.

By the deeds to defendants, Kalaau reserved to himself, in
effect, a life estate in his property.

The plaintiff is a woman of middle age, and swore that she was
an old friend of Kalaau, though not a relative; that she had
known him from childhood, and in her girlhood had stayed at
intervals in his family.	Just before the will was drawn she vis-
ited Kalaau's house, and learned that he was staying with his
wife in rooms adjacent to Queen Kapiolani's stables.	She went
and found him there, lying on a mat on the floor, but partly
dressed, and apparently uncared for.	Alakema and Kapika were

also there. Kapika says the rooms were rooms of Alakema's sister. Kalaau, against Kapika's remonstrance, left at once, and went with plaintiff to his own house. Two or three days after that the will to plaintiff was drawn by a native, Kukahiko, procured by plaintiff at Kalaau's request. Plaintiff swears it was drawn by Kalaau's express direction; that he said he did not want to make a deed, but a will to her, because if he deeded to her she would not take care of him. Plaintiff says she told him to deed half to his wife, but he said no, as his wife did not take care of him. For a couple of months thereafter plaintiff furnished food to Kalaau, and collected his rents.

About December 28, 1882, plaintiff and Kukahiko saw a notice pasted on a fence on Kalaau's premises, signed "Kapika," in substance forbidding the payment of rent to anybody else, as she had bought the land of Kalaau. They went to Kalaau's house, and plaintiff's version of the ensuing quarrel is that she told him she had seen the notice by his wife that she had bought the land of him, and he at once became very angry. He said he did not sell his place, and that plaintiff must go to the lawyer Hatch with him. He asked his wife if he had sold his property, and she said no; he started to go, and his wife held on to him, and they quarreled and struggled and fell down together. Mrs. Howland says Mr. Hatch was sent for, and came and said he drew the deeds, and Kalaau said he did not understand it so. Hatch left, and Kalaau said he must have a lawyer to annul the deeds. Kapika, however, swears that Hatch asked Kalaau if he wished to set aside the deed, and he said no. Mr. Thurston came the same day with Kukahiko, and Kalaau showed anger, and said that the land was his; that he had not sold it; that there was a fraud about the land. Mr. Thurston failed to get a straight story, and went away, and in four or five days returned and saw Kalaau and his wife only. The plaintiff was not then present. Kalaau's manner had changed. He was quiet, and said, "It is done; it will do." Mr. Thurston's impression was that Kalaau was cowed down by outside influence. Kapika says that at the quarrel the plaintiff and Kukahiko told Kalaau that he had lost his land, and would be like a beggar in the streets if his wife had a mind to turn him out. He asked, "Will that be so?" and they said,

"Yes," and in consequence of that Kalaau got angry with Ka-pika, that she did not tell him he had not sold his land.

From the plaintiff's evidence of Kapika's infidelity, and the lack of care to Kalaau, and dissent to the deeds, with his feeble-ness of mind and body, the plaintiff claims that she must prevail. That it is impossible to believe he intended to do what was done by the deeds. As against this, however, comes the strong proof of Hatch, and Widemann, the acknowledging officer. Mr. Hatch says the defendant and Kalaau and the sister of Alakema were present; that he thinks Kalaau handed him the Royal Patent; that he asked who was to be the grantee in the deed; that they replied Kapika, but he don't know who replied; that he then ex-plained that Kalaau could not deed directly to his wife, but must deed to a third party, and from a third party to his wife, and suggested Alakema to be the third party, and Kalaau said, "Yes." Then he wrote the deeds in Hawaiian, and went near the parties and read the deeds slowly to Kalaau. He assented to them, say-ing yes from time to time as they were read to him. Then Judge Widemann was called in, and Hatch asked him to explain the deeds to the old man, and he did so. Judge Widemann confirms the testimony of Hatch, and says he took special pains to explain the matter to Kalaau, and believes he understood it fully. If he understood the will to the plaintiff, and then knew the difference between it and a deed, I do not see how he could fail to under-stand these deeds. At the quarrel he suggested the name of Hatch as the lawyer who, he said, had wronged him; six weeks had passed, but he remembered him. How can we believe he did not know what was done by Hatch, and was so carefully ex-plained to him. The after dissent is not sufficient to show that he did not really intend what was done by the deeds. It may have been simulated, as suggested, to mollify Mrs. Howland. It may have been caused by what Kapika says, that they told him that he might be driven by her into the street destitute, which was untrue.

For fourteen months after the quarrel he failed to bring an ac-tion to set aside the deeds. He sent for the plaintiff, and asked for the rent she had collected for him. It is unnatural to believe he was in fear all this time. The nature of the quarrel shows

that he then had no fear of Kapika. The evidence does not convince me that he was ever in fear or coerced. The evidence of constant neglect seems unreliable, and, if he intended to consent to the deed, is futile. It is only important as tending to show the absence of such an intention. He may have suspected or believed his wife unfaithful, but, if so, he seems to have forgiven her, or at least not to have sought any remedy against her; such forgiveness is not improbable. He had lived with her for many years. As his wife she had a right to ask him to provide for her. But no influence seeking that is proved, and no undue influence ought to be inferred in the case. "Circumstances of mere suspicion, leading to no certain results, will not be deemed a sufficient ground to establish fraud." Story Eq. Jur., Sec. 190.

There are circumstances of suspicion on both sides. There is no good reason for making the will to Mrs. Howland. The motive of revenge upon his wife seems not enough. It looks as if, in his weakness, Mrs. Howland may have unduly influenced him to will to her. Against such attempts on his good nature thereafter, it may be the old man was willing to guard, as he did by the deeds. His acts show that he may have repented the execution of the will.

The evidence of Mr. Kinney of dishonest proposition by defendant Alakema as to deed or release, which possibly may have referred to instrument by Kalaau, though there is no proof of it, occurring long after the deeds were executed, may cast suspicion on his acts and evidence, but the case is strong without him. Other ear-marks, showing shades of untruth, appear on both sides, but there is not enough to countervail the strong showing of the free execution and delivery of the deeds by a competent grantor.

For these reasons, the bill must be dismissed with costs.